# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FT. MYERS DIVISION

**JAMES C. GIONFRIDDO, JR.,**

       **Plaintiff,**

**-vs-**                                       **Case No.  2:12-cv-381-FtM-DNF**

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security[1],**

       **Defendant.**

_____

# OPINION AND ORDER

      James C. Gionfriddo ("Plaintiff"), proceeding *pro se*, is seeking judicial review of the final decision of the Commissioner of the Social Security Administration denying his claim for a period of disability, Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")[2]. The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties filed legal memoranda in support of their positions.  On June 24, 2013, Plaintiff filed a reply in opposition to the Commissioner's memorandum.  For the reasons set out herein, the Court orders that the decision of the Commissioner be **AFFIRMED**, pursuant to § 205(g) of the Social Security Act, 42 U.S.C § 405(g).

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted, therefore, for Commissioner Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Because the disability definitions for DIB and SSI are identical, cases under one statute are persuasive as to the other.  *Patterson v. Bowen*, 799 F.2d 1455, 1456 n.1 (11th Cir. 1986); *McCruter v. Bowen*, 791 F.2d 1544, 1545 n.2 (11th Cir. 1986).

## I. SOCIAL SECURITY ACT ELIGIBILITY, PROCEDURAL HISTORY, AND STANDARD OF REVIEW

The law defines disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § § 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d) (2); 20 C.F.R. § § 404.1505-404.1511.

### A.        Procedural History

On March 19, 2008, Plaintiff filed applications for a period of disability, DIB and SSI alleging a disability onset date of March 1, 2006. (Tr. 16).  Plaintiff's request for benefits was initially denied on May 29, 2008, and upon reconsideration on August 19, 2008. (Tr. 16).  An administrative hearing was held by video before Administrative Law Judge ("ALJ") Mary Brennan on May 26, 2010. (Tr. 27-52).  Plaintiff and vocational expert Jeannine M. Salek testified at the hearing. (Tr. 28).  On June 10, 2010, the ALJ rendered her decision, in which she determined that Plaintiff was not disabled within the meaning of the Social Security Act from March 1, 2006, through the date of the ALJ's decision. (Tr. 24).  Plaintiff's Request for Review was denied by the Appeals Council on April 8, 2011. (Tr. 4-7).

### B.        Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405 (g).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate support to a conclusion.  Even if the evidence preponderated against the Commissioner's findings, we must affirm if the decision reached is

supported by substantial evidence." *Crawford v. Comm'r.*, 363 F.3d 1155, 1158 (11th Cir. 2004)

(citing *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)); *Martin v. Sullivan*, 894 F.2d

1520, 1529 (11th Cir. 1990). In conducting this review, this Court may not reweigh the evidence

or substitute its judgment for that of the ALJ, but must consider the evidence as a whole, taking

into account evidence favorable as well as unfavorable to the decision. *Martin v. Sullivan*, 894

F.2d 1329, 1330 (11th Cir. 2002); *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

However, the District Court will reverse the Commissioner's decision on plenary review if the

decision applied incorrect law, or if the decision fails to provide sufficient reasoning to

determine that the Commissioner properly applied the law. *Keeton v. Dep't. of Health & Human*

*Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).  The Court reviews de novo the conclusions of law

made by the Commissioner of Social Security in a disability benefits case. Social Security Act, §

205(g), 42 U.S.C.A. § 405(g).

      The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§

404.1520, 416.920.  In step one, the claimant must prove that he is not undertaking substantial

gainful empoyment. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001), *see* 20 C.F.R. §

404.1520(a)(4)(i).  If a claimant is engaging in any substantial gainful activity, he will be found

not disabled. 20 C.F.R. § 404.1520(a)(4)(I).

      In Step Two, the claimant must prove that he is suffering from a severe impairment or

combination of impairments. *Doughty*, 245 F.3d at 1278; 20 C.F.R. § 1520(a)(4)(ii). If the

claimant's impairment or combination of impairments does not significantly limit his physical or

mental ability to do basic work activities, the ALJ will find that the impairment is not severe, and

the claimant will be found not disabled. 20 C.F.R. § 1520(c).

In Step Three, the claimant must prove that his impairment meets or equals one of impairments listed in 20 § C.F.R. Pt. 404, Subpt. P. App. 1; *Doughty*, 245 F.3d at 1278; 20 C.F.R. § 1520(a)(4)(iii). If he meets this burden, he will be considered disabled without consideration of age, education and work experience. *Doughty*, 245 F.3d at 1278.

In Step Four, if the claimant cannot prove that his impairment meets or equals one of the impairments listed in Appendix 1, he must prove that his impairment prevents him from performing his past relevant work. *Id*. At this step, the ALJ will consider the claimant's RFC and compare it with the physical and mental demands of his past relevant work. 20 C.F.R. § 1520(a)(4)(iv); 20 C.F.R. § 1520(f) . If the claimant can still perform his past relevant work, then he will not be found disabled. *Id*.

In the Step Five, the burden shifts to the Commissioner to prove that the claimant is capable of performing other work available in the national economy, considering the claimant's RFC, age, education, and past work experience. *Doughty*, 245 F.3d at 1278; 20 C.F.R. § 1520(a)(4)(v). If the claimant is capable of performing other work, he will be found not disabled. *Id*. In determining whether the Commissioner has met this burden, the ALJ must develop a full and fair record regarding the vocational opportunities available to the claimant. *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). There are two ways in which the ALJ may make this determination. The first is by applying the Medical Vocational Guidelines ("grids"), and the second is by the use of a vocational expert. *Phillips v. Barnhart*, 357 F.3d 1232, 1239 (11th Cir. 2004).  Only after the Commissioner meets this burden does the burden shift back to Claimant to show that he is not capable of performing the "other work" as set forth by the Commissioner. *Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

## II.   REVIEW OF FACTS

### A.  Background Facts

Plaintiff was born on November 8, 1969, and was 40 years of age at the time of the ALJ's decision. (Tr. 23, 173).  Plaintiff  has a high school education and is able to communicate in English. (Tr. 23). He has past relevant work experience as a painter and furniture mover/driver. (Tr. 23).  Plaintiff alleged disability based on three herniated discs. (Tr. 187).

Plaintiff worked after the alleged disability onset date but the ALJ determined this work activity did not rise to the level of substantial gainful activity. (Tr. 18).  According to Plaintiff's earning records, Plaintiff had earnings from work activity of $1,050.00 in the fourth quarter of 2008 and $11,176.00 in the third and fourth quarters of 2009. (Tr. 18).

### B.  The ALJ's Findings

At the first step, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through September 30, 2011, and had not engaged in substantial gainful activity since his alleged onset date of March 1, 2006.  (Tr. 18).

At the second step, the ALJ determined that Plaintiff suffered from the severe impairment of lumbar stenosis with chronic intermittent low back pain. (Tr. 19).

At the third step, the ALJ found that Plaintiff does not suffer from an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § Part 404, Subpart P, Appendix 1. (Tr. 19).

At the fourth step, the ALJ found that Plaintiff, through the date last insured, "has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except the claimant can never climb ladders and can occasionally climb stairs, stoop,

kneel, crouch, and crawl." (Tr. 19).  The ALJ concluded that Plaintiff would be unable to perform any past relevant work. (Tr. 23).

At the fifth step, the ALJ considered Plaintiff's age, education and work experience and determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 23).  Thus, the ALJ concluded that a finding of not disaled was appropriate. (Tr. 24).

### C. Summary of Medical Evidence

On March 14, 2005, Plaintiff presented to Rockton Hospital, Brockton, Massachusetts where he had an MRI taken of his lumbar spine. (Tr. 302).  Dr. Yoon Hyung Choi interpreted the MRI and found that L1-L2 and L2-L3 levels were unremarkable. (Tr. 302).  At L3-L4, Dr. Choi noted mild degeneration of the disc with loss of disc signal with preservation of disc height. (Tr. 302).   At the L4-L5, Dr. Choi noted that there was mild to moderate degeneration of the disc loss of disc signal and disc height and that there was a moderate sized right foraminal disc extrusion which narrows the right neural foramen and impresses on the existing nerve. (Tr. Dr. Choi noted that Plaintiff had, at the L5-S1, moderate degeneration of the disc with loss of the signal and disc height. (Tr. 302).  Dr. Choi also noted that there was a moderate sized left foraminal and lateral disc extrusion which narrowed the left neural foramen and abutted the existing nerve root. (Tr. 302).

On July 1, 2005, Plaintiff visited Family Practice Associates and was examined Dr. Mark H. Brus. (Tr. 322).  Dr. Brus noted that Plaintiff's current medications included Percocet, Lodine, and Flexeril. (Tr. 322).  Dr. Brus noted that Plaintiff had chronic back pain from disc herniations at right L4-5 left L5-S1 managed by pain management. (Tr. 322).  A physical examination of Plaintiff revealed that he weighed 196 pounds, had a blood pressure of 116/70

and a pulse of 64. (Tr. 322).  Dr. Brus noted that Plaintiff climbed slowly on and off the exam

table without assistance. (Tr. 322).  He noted that Plaintiff had some discomfort on extending the

left knee while seated, but not the right. (Tr. 322).  Dr. Brus noted that Plaintiff's chronic back

pain was generally stable with listed medications. (Tr. 322).

 On September 23, 2005, Plaintiff was examined by Dr. Brus. (Tr. 320).  Dr. Brus noted

that Plaintiff's current medications included Percocet, Lodine, and Flexeril. (Tr. 320).  Dr. Brus

noted that Plaintiff had chronic back pain from disc herniations at right L4-5 left L5-S1 managed

by pain management. (Tr. 320).  Dr. Brus refilled Plaintiff's prescription for Percocet. (Tr. 320).

 On December 23, 2005, Plaintiff was examined by Dr. Brus. (Tr. 318).  Dr. Brus noted

that Plaintiff's current medications included Percocet, Lodine, and Flexeril. (Tr. 318).  Dr. Brus

noted that Plaintiff had chronic pain from disc herniations at right L4-5 left L5-S1 managed by

pain management. (Tr. 318).  A physical examination of the Plaintiff revealed that Plaintiff

weighed 194 pounds and had a blood pressure of 116/84. (Tr. 318).  Dr. Brus noted that Plaintiff

climbed on and off the exam table without assistance. (Tr. 318).  Dr. Brus refilled Plaintiff's

prescriptions for Percocet, Lodine, and Flexeril. (Tr. 318).

 On June 22, 2006, Plaintiff was examined by Dr. Brus. (Tr. 249).  Dr. Brus noted that

Plaintiff's current medications included Percocet and Flexeril.(Tr. 249). Dr. Brus noted that

Plaintiff had chronic back pain from disc herniations at right L4-5 left L5-S1 which was

managed by pain management. (Tr. 249).  A physical examination of Plaintiff revealed that

Plaintiff weighed 195 pounds, had a blood pressure of 130/90, and that Plaintiff had a decreased

sense of touch to fiber probe in the distal half of the right hallux medially, but not elsewhere. (Tr.

249).  Dr. Brus noted that there were abrasions at the right knee and no peripheral erythema or

discharge. (Tr. 249).  Dr. Brus assessed that Plaintiff had 1) chronic back pain, which was stable

with current medications, 2) abrasions of the knee, which was healing without evidence of infection, and 3) paresthesia of the hallux, likely from ditial nerve trauma from the stitches of Plaintiff's shoe. (Tr. 249).  Dr. Brus refilled Plaintiff's prescription for Percocet. (Tr. 250).

On December 15, 2006, Plaintiff visited Dr. Brus for a follow-up. (Tr. 247).  Dr. Brus noted that Plaintiff's current medications included Percocet and Flexeril. (Tr. 247).  Dr. Brus noted that Plaintiff had chronic back pain from disc herniations at the right L4-5 left L5-S1 managed by pain management. (Tr. 247).  A physical examination of Plaintiff revealed that Plaintiff was still tender at the left L5. (Tr. 247).  Dr. Brus noted that Plaintiff extended his knees while seated without comfort. (Tr. 247).  Dr. Brus also noted that Plaintiff climbed on and off the exam table without assistance and walked well. (Tr. 247).  Dr. Brus assessed the following: 1) upper respiratory infection, with no obvious bacterial process, 2) chronic back pain, which was stable with Percocet, and 3) health maintenance. (Tr. 247).  Dr. Brus refilled Plaintiff's Percocet prescription and ordered an x-ray of Plaintiff's lumbrosacral spine. (Tr. 248).

On August 20, 2007, Plaintiff visited Dr. Brus for a follow-up. (Tr. 245).  Dr. Brus noted that Plaintiff's current medications included Percocet and Flexeril and that Plaintiff's medical problems included chronic back pain from disc herniation at right L4-5 and S1 managed by pain management.  A physical examination of Plaintiff revealed that he climbed on and off the exam table without assistance, that he was tender to palpation at the L5 S1 spinous processes area, and that he had pain right of the L5 area with palpable spasm. (Tr. 245).  Dr. Brus assessed chronic low back pain and refilled Plaintiff's Percocet prescription. (Tr. 245-246).

On May 29, 2008, Plaintiff visited Dr. Iraj Golzari, MD for a consultative examination. (Tr. 258).  Dr. Golzari noted that Plaintiff had a history of severe back pain for the last two years. (Tr. 28).  Dr. Golzari noted that Plaintiff was not currently on any medications. (Tr. 258).  Dr.

Golzari also noted that Plaintiff was not able to bend, sit or stand for a long time and that epidural injections had not helped. (Tr. 258).  A physical examination of Plaintiff revealed that Plaintiff did not require any assistive device for ambulation, that his walking was normal, that he had the ability to squat and rise, and that he had the ability to get on and off the exam table. (Tr. 261).  Dr. Golzari noted that Plaintiff was tender at his lumbar and made a diagnosis of "PROBABLY LUMBAGO." (Tr. 261).  Dr. Golzari opined that Plaintiff could not be employed in any but a sedentary position. (Tr. 261).

An MRI of Plaintiff's lower back was performed on January 29, 2010, by Dr. Douglas L. Elland, MD. (Tr. 299).  Dr. Elland's notes show that a 4 mm sagittal and axial sections were obtained with T1 and T2 technique. (Tr. 299).  Dr. Elland found that the vascular structures had a normal appearance and that there was no periaortic adenopathy. (Tr. 299).  Dr. Elland noted that at the L5-S1 there was dessiccation and diffuse protrusion of the disc, that there were degenerative changes along adjacent vertebral body endplates, and normal signal intensity in the spinal cord and nerve roots. (Tr. 299).  At the L4-5, Dr. Elland noted that there was desiccation and loss of height of the disc, asymmetrical disc protrusion to the right side, and no signal intensity in the spinal cord and nerve roots. (Tr. 299).  Dr. Elland also noted diffuse disc bulging at the L3-4. (Tr. 299).

### D.  Summary of State Agency Evaluations

On May 29, 2008, Kami Hayes[3] performed a Physical Residual Functional Capacity Assessment of Plaintiff. (Tr. 265).  Ms. Hayes found that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and could push and/or pull without limit, other than as shown for lift and/or carry. (Tr. 266).  Further, Ms. Hayes found that Plaintiff

_____

[3] The record does not indicate Ms. Hayes credentials.

could frequently balance, stoop, kneel, crouch, crawl and climb ramp/stairs, and only occasionally climb ladder/rope/scaffolds. (Tr. 267). Ms. Hayes found that Plaintiff did not have any manipulative, visual, communicative, or environmental limitations. (Tr. 268-269). Ms. Hayes noted that Plaintiff's symptoms appeared credible but determined his function was restricted to within the limits of her RFC. (Tr. 270). Ms. Hayes also explained that her opinion of Plaintiff's residual functional capacity differed from that of Dr. Golzari, an examining source, because in her opinion Dr. Golzari's findings were not supported by objective findings. (Tr. 271).

On July 11, 2008, James Andriole, D.O., performed a Physical Residual Functional Capacity Assessment of Plaintiff. (Tr. 273). Dr. Andriole found that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday and push and/or pull without limit, other than as shown for lift and/or carry. (Tr. 274). Further, Dr. Andriole found that Plaintiff could occasionally climb ramp/stairs, balance, stoop, kneel, crouch, or crawl, and could never climb ladder/rope/scaffolds. (Tr. 275). Dr. Andriole found that Plaintiff did not have any manipulative, visual, communicative, or environmental limitations. (Tr. 277-278). Dr. Andriole noted that the severity of Plaintiff's symptoms was generally consistent with the total medical evidence and non-medical evidence and that Plaintiff's RFC was reduced accordingly to reflect the work capacity that was obtainable given his medical conditions. (Tr. 278).

On August 14, 2008, Meredith Seckendorf, Ed.D., and Lynn R. Bernstein, Ph.D., performed a General Clinical Evaluation and MSE upon the request of the Office of Social Security Disability Determinations. (Tr. 282-283). The doctors noted that Plaintiff drove himself to the appointment. (Tr. 282). The doctors noted Plaintiff's history of chronic lumbar pain at

level 8 with pain radiating into Plaintiff's right leg and foot. (Tr. 282).  The doctors noted that

Plaintiff stated that he took over the counter aspirin and Tylenol, approximately six times daily

and that he could not afford medical care or medications.  The doctors noted that Plaintiff began

feeling depressed in April of 2008 and described sadness about his inability to support his child

and reported problems sleeping, isolation and despair about inadequate pain relief. (Tr. 282).  A

mental status exam of Plaintiff revealed that he was cooperative, relevant, oriented x3 and that he

evidenced depressed mood and depressed affect. (Tr. 282).  The doctors noted that Plaintiff

described his typical days as follows.  Plaintiff provided that he gets poor sleep, that he gets up

around 11-12, that he spends his days reading the newspaper and magazines, that he watches TV,

that he tries to mow the lawn every 2 days due to inability to tolerate at one sitting, that he

washes dishes, that he cares for his son, and that he goes to bed from 11-12. (Tr. 283).  Plaintiff

stated that he has some friends who stop by from time to time. (Tr. 283).  The doctors' prognosis

was "Fair with treatment." (Tr. 283).

On August 18, 2008, Sharon Ames-Dennard, Ph.D., completed a Psychiatric Review

Technique. (Tr. 284-297).  Dr. Ames-Dennard found that Plaintiff had medical impairments that

were not severe and coexisting nonmental impairment(s) that required referral to another medical

specialty. (Tr. 284).  The category upon which the medical disposition was based was

somatoform disorders. (Tr. 284).  Dr. Ames-Dennard found that Plaintiff had no restrictions on

daily living, no difficulties in maintaining social functioning, no difficulties in maintaining

concentration, persistence, or pace, and no episodes of decompensation. (Tr. 294).  Dr. Ames-

Dennard noted that Plaintiff was diagnosed with pain D/O associated with both psychological

factors and general medical condition. (Tr. 296).  Additionallly, Dr. Ames-Dennard noted that

Plaintiff was capable of preparing meals if needed, performing household chores when needed,

able to shop, drive a car, care for family dog, socialize with family/friends, handle money when needed, and to care for his personal care needs. (Tr. 296).  Dr. Ames-Dennard concluded that Plaintiff may have a mental impairment, but that it was not believed to be of disabling proportions. (Tr. 296).

### E.  Summary of Hearing Testimony

A hearing was held before the ALJ on May 26, 2010. (Tr. 27-52).  Plaintiff testified as follows.  He stated that he was forty years old and the last grade of school he completed was the tenth grade. (Tr. 31).  He stated that he had a GED. (Tr. 31).  He stated that he had driven himself to the hearing and that it took approximately an hour to get there. (Tr. 31).

Plaintiff testified that he had last worked for a period of six months ending in December of 2009. (Tr. 31).  He previously worked as a painter and stopped working because it was a seasonal, part-time job and he had back problems. (Tr. 31-32).  Prior to this period of employment, Plaintiff worked as a painter for three weeks in 2008. (Tr. 32).  Plaintiff stated that he stopped this work because the travel time and the work took a toll on his back. (Tr. 32).  Plaintiff stated that prior to his work in 2008 that he had last worked in 2006 as a furniture mover and driver. (Tr. 32-33).  He had worked this job for about two years. (Tr. 33).  Part of this job required Plaintiff to actually carry furniture. (Tr. 33).  Plaintiff stopped working this job because of the travel back and forth to work. (Tr. 33).  Before this job Plaintiff explained that he worked as a painter for a company in Massachusetts. (Tr. 33).  He stopped working this job because he moved to Florida. (Tr. 33).  Plaintiff testified that he was still looking for work and was willing to take any job that was easy and that he was able to handle. (Tr. 34).

Plaintiff explained that he suffers from chronic back pain which prevents him from working. (Tr. 34).  He stated that there are good days and bad days where he cannot walk at all

and only sits for periods of time. (Tr. 34).  He stated that it is off and on, and that sometimes he cannot sit for periods of time or walk at all. (Tr. 34).  Plaintiff testified that the bad days occur on average about 3 out of 7 days. (Tr. 34).  On these days Plaintiff has problems walking and standing. (Tr. 34).  Plaintiff stated that on a typical day he can stand a couple hours to an hour. (Tr. 35).  On an average day Plaintiff can stand for 15 or 20 minutes without pain.  Plaintiff explained that he can stand without pain for about an hour before needing to sit or lie down. (Tr. 35).  Plaintiff stated that sitting is a problem. (Tr. 35).  Plaintiff stated that on an average day, he can sit without pain for about 20 to 30 minutes before he needs to move his body position or stand up. (Tr. 35).

Plaintiff testified that he was receiving pain management medication including narcotic pain management. (Tr. 35).  Plaintiff testified that he experiences withdrawals as a side-effect of taking the pain management medication. (Tr. 36).  Plaintiff also that he experiences the side-effects of tiredness and nausea. (Tr. 36).  Plaintiff testified that he had epidural injections which helped him for a month to two months before the pain returned. (Tr. 36).  Plaintiff testified that he had talked to his doctors about surgery and that they recommended it. (Tr. 36).  Plaintiff stated that he has not had surgery because he cannot afford it. (Tr. 36).

Plaintiff explained that he tries to walk, does a little swimming, and does exercises in the pool to help with his back. (Tr. 37).  Plaintiff testified that on an average day he can walk two blocks but will experience pain. (Tr. 37).  Plaintiff stated that he has problems lifting things.  (Tr. 37).  Plaintiff testified that he can lift a gallon of paint, which weighs 8 to 10 pounds, but that he cannot lift two gallons of paint because of his back. (Tr. 37).

Plaintiff explained that his back pain is caused by an accident he had where he fell off a dock about twelve years before the hearing. (Tr. 37).  Plaintiff testified that the pain has gotten worse with time. (Tr. 38).

Plaintiff testified that the pain affects his ability to drive and that he can drive about an hour or even less before he has problems. (Tr. 38).  Plaintiff stated that he has to change movements or his sitting position to make it comfortable. (Tr. 38).  Plaintiff stated that he experienced pain while driving to the hearing. (Tr. 38).  Plaintiff testified that his back pain causes him to have problem sleeping. (Tr. 38).

Plaintiff explained that he had to stop working in March of 2006 because he could not move his back, lift anything or walk. (Tr. 38).  The job required heavy lifting so Plaintiff could not handle the work. (Tr. 38).  Plaintiff testified that he only worked for three weeks in 2008 because the work took a toll on his back. (Tr. 39).  Plaintiff stated that he could not handle the bending and overhand painting the job required. (Tr. 39).  Plaintiff stated that it sometimes hurts him to reach his arms over his head and sometimes to bend.  (Tr. 39).

Plaintiff stated that feels the pain in his lower back and down his left leg. (Tr. 40).  Plaintiff stated that the pain makes it sometimes hard to think or concentrate. (Tr. 40).  Plaintiff testified that he cannot sit to watch a movie or play with his young son. (Tr. 40).  Plaintiff stated that he only does light chores like doing dishes. (Tr. 41).  Plaintiff stated that he can do work for about 30 to 40 minutes before needing to sit down because of the lower back pain. (Tr. 41).  Plaintiff testified that he does not do any shopping because he can't stand and walk in the aisles for very long. (Tr. 41).  Plaintiff stated that he has given up his hobbies of hockey, football, basketball, and sports because of the pain. (Tr. 42).  Plaintiff stated that he is depressed and takes Xanax. (Tr. 42).

Plaintiff testified that he went back to work in 2009 as a painter because his family needed the money. (Tr. 42).  Plaintiff stated that the job made special concessions for him such as giving him a helper to help him move ladders and five-gallon paint cans. (Tr. 42-43).  Plaintiff stated that his job ended because it was a seasonal position. (Tr. 43).  Plaintiff stated that he had reapplied for the painting position but was not hired. (Tr. 43).  Plaintiff speculated he was not rehired because the company did not want to have to pay for a helper again. (Tr. 44).  Plaintiff testified that he missed approximately three to four days during his 2009 employment due to his back. (Tr. 44).

Plaintiff stated that on days when his back is out that he cries and tries to do anything to make his back comfortable. (Tr. 44-45).  Plaintiff testified that he could not work a job that requires him to climb up on ladders and carry things, where he could sit and stand, but that he had to be there eight hours a day, five days a week. (Tr. 45).  Plaintiff stated that he could not work the job because he could not sit five or six hours at a time. (Tr. 45).  Plaintiff testified that he would have trouble concentrating for an eight-hour day because of his pain. (Tr. 45).

Plaintiff testified that he worked eight-hour days when he was working as a painter in 2009 and that he took narcotic medication while working. (Tr. 45).  Plaintiff testified that he sees Sarasota Pain Management about once a month. (Tr. 47).  Plaintiff stated that Sarasota Pain Management does not do anything for him other than provide medicine. (Tr. 47).

After Plaintiff testified, the ALJ questioned a vocational expert, Jeannine M. Salek, as follows.  The ALJ asked Ms. Salek whether Plaintiff would be able to do any of his past work if the ALJ found that Plaintiff was limited to light work lifting twenty pounds on occasion, and walking six hours; sitting or standing six hours in an eight-hour day; that Plaintiff is unable to climb ladders; and that Plaintiff can occasionally climb stairs, stoop, kneel, crouch, or crawl. (Tr.

48-49).  Ms. Salek responded that the Plaintiff would not be able to because he does not have

transferable skills to light work and Plaintiff would be relegated to unskilled work. (Tr. 49).  The

ALJ next asked Ms. Salek whether she could identify unskilled jobs with postural limitations

from medication. (Tr. 49).  Ms. Salek identified two jobs.  The first job Ms. Salek identified was

the job of security guard. (Tr. 49).  Ms. Salek testified that there are one million such jobs

nationally, seventy-four thousand in the state of Florida, and two thousand regionally in in Fort

Myers. (Tr. 49).  Ms. Salek also identified the job "Cashier II." (Tr. 49).  Ms. Salek testified that

the job is light level work. (Tr. 49).  Ms. Salek testified that there are two million such jobs

nationally, one hundred and six thousand jobs in the state of Florida, and ten thousand regionally.

(Tr. 49).

The ALJ asked Ms. Salek whether there are sedentary jobs that permit alternating sitting

and standing. (Tr. 5).  Ms. Salek testified that one such job is dispatcher for a maintenance

service. (Tr. 50).  Ms. Salek testified that there are two hundred and fifty thousand such jobs

nationally, ten thousand in the state of Florida, and three hundred and fifty regionally. (Tr. 50).

Ms. Salek also identified, order clerk. (Tr. 50).  Ms. Salek testified that there are two hundred

thousand such jobs nationally, two thousand in the state of Florida, and four hundred such jobs

regionally. (Tr. 50).  Ms. Salek testified that another such job is surveillance system monitor. (Tr.

50).  Ms. Salek testified that there are about two hundred and seventy one such jobs nationally,

about sixteen thousand such jobs in the state of Florida, and three hundred and fifty such jobs

regionally. (Tr. 50-51).

Finally, the ALJ asked Ms. Salek whether there were any jobs for an individual with

Plaintiff's age, education, and work experience, where the individual can stand or walk for less

than two hours, sit for less than six hours, and that he would miss at least three days of work per

month. (Tr. 51).  Ms. Salek testified that such an individual would not be able to work any job

within the labor market. (Tr. 51).

## III.    ISSUES ON APPEAL

Plaintiff's *pro se* Memorandum in Support of the Allegations in the Complaint provides

in its entirety:

### Plaintiff James C Gionfriddo Jr's Memorandum of Law
### in Support of the Allegations in the Complaint

The intent of this Memorandum of Law is to overturn the Administrative Law
Judge ruling and to Appeal the decision to deny Social Security Benefits.

### Facts

The disability has prevented the Plaintiff from holding any occupation.  The
Plaintiff has applied for benefits 4 ½ years ago.

### Argument

During the Administrative Law Judge Hearing, the Vocational Expert testified
that based on the Plaintiffs' type of injury, time missed from work from attending
medical appointments and time missed from work due to chronic pain, there is no
occupational [sic] that the Plaintiff can perform

### Conclusion

Based on the above testimony given by the Vocational Expert; as well as all the
other Medical Excerpts/Briefs/Records that have been filed with the court, the
Plaintiff should be given this right to claim these benefits

(Pl.'s Mem. at 1-2).  The Court construes Plaintiff's Memorandum to raise two issues on appeal:

(1) whether the ALJ erred by disregarding the vocational expert's testimony that there are no

occupations that Plaintiff can perform, and (2) whether substantial evidence supports the ALJ's

RFC determination.    Defendant argues that the vocational expert's testimony provided

substantial evidence to support the ALJ's finding that Plaintiff could perform other work and that

substantial evidence supports the ALJ's decision as a whole. (Def.'s Mem. at 4-9).

**A. Whether the ALJ Erred by Disregarding the Vocational Expert's Testimony**

Plaintiff argues that the testimony of the vocational expert provides substantial evidence that there are no occupations Plaintiff can perform given his RFC and, thus, that the ALJ erred in his determination that Plaintiff is not disabled. Defendant responds that the vocational expert's testimony provides substantial evidence that there are jobs Plaintiff can perform given his RFC.

If an ALJ determines that a claimant is unable to do past relevant work, the ALJ must proceed to the fifth and final step of the evaluation process to determine whether the claimant is capable of performing any other work given the claimant's RFC, age, education, and work experience. *Wilson v. Barnhart,* 284 F.3d 1219, 1227 (11th Cir. 2002). Often, the ALJ may make this determination through exclusive reliance on the grids. *Jones v. Apfel,* 190 F.3d 1224, 1229 (11th Cir. 1999). However, reliance on the grids is inappropriate when the claimant cannot perform a full range of work at a given level of exertion. *Id.* In such cases, the ALJ may determine if the claimant can work other jobs by eliciting testimony from a vocational expert. *Id.* A vocational expert's testimony constitutes substantial evidence when the ALJ poses a hypothetical question that comprises all of the claimant's impairments. *Id.*

In this case, the ALJ determined that Plaintiff was unable to perform his past relevant work and, thus, the burden shifted to the ALJ to establish that Plaintiff was capable of performing any other work given Plaintiff's RFC, age education and work experience. (Tr. 23). As the ALJ found that Plaintiff could not perform a full range of work at the light work level, the ALJ could not rely exclusively on the grids, but needed to elicit testimony from a vocational expert. The record indicates that the ALJ asked the vocational expert whether an individual with Plaintiff's age, education, work experience, and RFC could perform any other work. (Tr. 48-49). The vocational expert testified that such an individual could perform such jobs as security guard and cashier. (Tr. 49). Because the ALJ's hypothetical question encompassed the entirety of

-18-

Plaintiff's RFC limitations, the Court finds that the vocational expert's testimony constitutes substantial evidence that there are other jobs which Plaintiff can perform.

Plaintiff's argument that the vocational expert testified that Plaintiff is incapable of performing any other work is based on a misunderstanding of the vocational expert's testimony. The vocational expert's testimony that Plaintiff alleges shows that there are no occupations he can work was elicited in the following exchange:

> **ALJ**: And what about an individual again with the [Plaintiff]'s age, education, and work experience – well if he's able to sot [sic] – to stand or walk for less than two hours, sit for less tha[n] six hours, and more significantly that he would miss at leas[t] three days of work per month, would you (INAUDIBLE) or any jobs?

> **Vocational Expert**: No they would not, they would not be able to perform any jobs within the labor market. That would be less than sedentary work, and also generally the rule of thumb is one unexcused absence per month.

(Tr. 51). Plaintiff argues that the vocational expert's response to this question provides substantial evidence that Plaintiff is disabled. (Pl.'s Reply p. 1). However, a careful reading of the vocational expert's testimony reveals that her response to the above hypothetical question relates to the types of occupations available to an individual with greater RFC limitations than those possessed by Plaintiff. The ALJ determined that Plaintiff has the RFC to perform light work except that he can never climb ladders and can occasionally climb stairs, stoop, kneel, crouch, and crawl. (Tr. 19). The hypothetical question above does not relate to Plaintiff's RFC limitations and, thus, does not constitute evidence that Plaintiff is incapable of working other jobs in the economy.

Contrary to Plaintiff's claim, the testimony of the vocational expert is substantial evidence that Plaintiff is capable of working other occupations. The ALJ did not err by disregarding the vocational expert's testimony, but correctly considered in in determining that Plaintiff was not disabled.

**B.  Whether Substantial Evidence Supports the ALJ's RFC Determination**

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence and should have included the additional limitations the ALJ included in his final hypothetical question to the vocational expert.  Defendant argues that substantial evidence supports the ALJ's RFC determination.

Plaintiffs bear the burden of proving that they are disabled. *Ellison v. Barnhardt,* 355 F.3d 1272, 1276 (11th Cir. 2003).  Here, Plaintiff has failed to meet his burden and the Court finds that substantial evidence supports the ALJ's determination that Plaintiff has the RFC to perform light work except that he can never climb ladders and can occasionally climb stairs, stoop, kneel, crouch, and crawl.  Although the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms are not credible to the extent that they are inconsistent with the ALJ's RFC determination. (Tr. 21).

The ALJ noted that Plaintiff's medical records fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the Plaintiff were in fact disabled. (Tr. 21).  For example, the ALJ noted that a treatment note in June of 2006 indicated that Plaintiff's chronic back pain was stable with medications, and that in December of 2006 Plaintiff was able to extend his knees while seated without discomfort, climb on and off an exam table without assistance, and walk well. (Tr. 21).  The ALJ noted Plaintiff's largely normal examinations of his extremities, spine, and ambulation in May, 2008. (Tr. 22).  The ALJ noted that in May and August 2008, Plaintiff reported that he was taking no medications or only over-the-counter

medications. (Tr. 22). Further, the ALJ noted that Plaintiff's January 29, 2010 a lumbar spine MRI did not reflect any disc herniation or nerve impingement. (Tr. 21).

Additionally, the ALJ noted that Plaintiff has described daily activities which are not limited to the extent one would expect given Plaintiff's complaints of disabling symptoms and limitations. (Tr. 22). The ALJ noted that Plaintiff reported that he has friends that stop by from time to time, that he spends his days reading the newspaper and magazine, and watching TV. (Tr. 22). Further, the ALJ noted that Plaintiff reported that he tries to mow his lawn every 2 days due to an inability to tolerate sitting and that he washes dishes. (Tr. 22). The ALJ found it particularly notable that Plaintiff cares for his young son because this can be quite demanding both physically and emotionally. (Tr. 22).

The ALJ cited to Plaintiff's testimony regarding his employment after his alleged onset date. The ALJ found it notable that Plaintiff stopped working his 2009 painting job, not due to his impairment, but because it was seasonal employment. (Tr. 22). The ALJ explained that Plaintiff's search for work during his alleged disability suggests that Plaintiff's condition is not so severe that he is unable to perform work activities within the ALJ's RFC determination. (Tr. 22).

Plaintiff has failed to carry his burden of proving that he is disabled and substantial evidence supports the ALJ's decision. Accordingly, this Court will not disturb the Commissioner's decision upon review.

## IV.    CONCLUSION

For the reasons explained above,

### IT IS HEREBY ORDERED:

1) The final decision of the Commissioner is **AFFIRMED**.

2)  The Clerk of Court is directed to enter judgment for the Commissioner and close the

case.

**DONE** and **ORDERED** in Fort Myers, Florida on August 20, 2013.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk of Court Mail or Deliver Copies of this Order to All Parties and All Counsel of Record